**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) | MDL No. 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| CITY OF CAMDEN; CITY OF SIOUX FALLS; CALIFORNIA WATER SERVICE COMPANY; CORAOPOLIS WATER & SEWER AUTHORITY; TOWNSHIP OF VERONA, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*-vs-*<br><br>ARCHROMA U.S., INC.,<br><br>*Defendant.* | ) | **CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs CITY OF CAMDEN, CITY OF SIOUX FALLS, CALIFORNIA WATER SERVICE COMPANY, CORAOPOLIS WATER & SEWER AUTHORITY, AND TOWNSHIP OF VERONA (collectively "Proposed Class Representatives"), by and through their attorneys Baron & Budd P.C., Douglas & London P.C., and Motley Rice LLC (collectively "Proposed Class Counsel"), for their Class Action Complaint against Defendant Archroma, U.S., Inc. ("Defendant" or "Archroma"), allege on behalf of themselves and others similarly situated as follows:

**INTRODUCTION AND BACKGROUND**

1. The Proposed Class Representatives are public water entities and/or private companies that provide drinking water to the public ("Public Water Systems"), and bring this class action lawsuit on behalf of themselves and other similarly situated Public Water Systems (the "Proposed Class Members") arising from the widespread contamination of drinking water supplies

by per- and polyfluoroalkyl substances ("PFAS"), a family of chemical compounds that includes perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

2. The Proposed Class Representatives and Proposed Class Members supply drinking water to millions of individuals and businesses nationwide. The Proposed Class Representatives own and/or operate public drinking water supply systems, which include groundwater supply wells and surface waters, that supply water to residences, schools, and businesses. These drinking water supplies have been contaminated with PFAS. The Proposed Class Representatives seek to represent all similarly situated owners and/or operators of drinking water supplies that have likewise been contaminated with PFAS or were required to test for it under UCMR-5.

3. Archroma designed, manufactured, marketed, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS, including but not limited to PFOA, and/or its chemical precursors for use in many products, including aqueous film-forming foam ("AFFF").

4. Raw telomer iodides, also known as fluorotelomer iodides, are the structural building blocks, produced via telomerization, and are primarily used to manufacture fluorosurfactants, AFFF, and stain-resistant coatings.

5. AFFF is a type of water-based foam that was first developed in the 1970's to extinguish hydrocarbon fuel-based fires.

6. AFFF is a Class-B firefighting foam. It is mixed with water and air and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

7. AFFF is manufactured by combining several ingredients, including hydrocarbon surfactants and fluorosurfactants. When mixed with water and air, the resulting solution produces

an aqueous bubbly film that spreads across the surface of hydrocarbon fuel. The combination of the foam blanket and film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

8. AFFF can be made without the fluorosurfactants that contain PFOA and/or its precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA and/or its precursor chemicals into the environment.

9. Defendant designed, manufactured, marketed, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS, including PFOA, and/or its chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed of at, near or within the vicinity of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members, and entered the environment, migrated through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating or threatening to contaminate the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

10. Defendant was aware or should have been aware that the raw telomer iodides it designed, manufactured, marketed, distributed, and/or sold would be used in AFFF products containing PFAS and foreseeably end up in Plaintiffs' drinking water supplies.

11. The Proposed Class Representatives bring this action, individually and on behalf of all others similarly situated, against Defendant to recover any and all relief with respect to the installation, maintenance and operation of, and cost associated with, any kind of treatment, filtration, remediation, testing, or monitoring of the ongoing contamination of their drinking water supplies proximately caused and/or created by Defendant's products, as well as any and all damages available as a result of the actions and/or inactions of Defendant, and to ensure that

Defendant, as the responsible party, bears such expense, rather than the Proposed Class Representatives and Proposed Class Members.

12. The Proposed Class Representatives seek to recover the substantial costs necessary to protect the public and restore their damaged drinking water supplies as well as those of other similarly situated Public Water Systems. These costs include, but are not limited to, the costs of testing and monitoring water supplies for PFAS contamination; the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to comply with state and federal drinking water regulations and to remove PFAS from the drinking water supplied to the public; and/or the costs of securing alternative sources of water as a result of PFAS contamination.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 (d) because there is minimal diversity of citizenship among the parties, there are more than 100 members of the proposed Class, and the amount in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs.

14. Venue is appropriate in this District pursuant to the Order of the Judicial Panel on Multidistrict Litigation which transferred and centralized all related action in this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C § 1407. In addition, venue is also applicable in this district, pursuant to 28 U.S.C §1391 because a substantial part of the events and omissions giving rise to the claims asserted occurred in this district.

15. Case Management Order No. 4 authorizes direct filing of the claim to this judicial district.

## PARTIES

**Proposed Class Representatives for the Proposed Class**

16. **Plaintiff City of Camden ("Camden")** is located in Camden County, New Jersey and a citizen of the State with a population of approximately 72,000. Camden provides drinking water to approximately two-thirds of all residents of the City of Camden, with approximately 14,533 metered accounts.

17. Camden's system consists of 20 wells that draw from the lower Potomac Raritan-Magothy Aquifer. The system has a maximum pumping rate of 27,600 gallons per minute. The 19 wells are spread across four wellfields throughout Pennsauken and the City of Camden. As of May 2023, 17 of the 20 wells were active and, of these 17 active wells, 8 have been taken out of service due to PFAS contamination, which is believed to have resulted from firefighting training activities by the City of Camden's fire department.

18. Camden's system utilizes two treatment plants, which treat ground water for iron and manganese removal by oxidation, settling and filtration. Volatile organic chemicals are removed via packed tower aeration. All treated water is disinfected with chlorine to maintain water quality in the distribution system. Fifteen of the groundwater wells are treated at the Morris-Delair Water Treatment Plant and two wells are treated at the Parkside Water Treatment Plant. Aside from PFAS, no other regulated contaminants have been detected in Camden's drinking water supply at levels above the relevant state or federal Maximum Contaminant Levels ("MCLs").

19. PFAS were first detected in Camden's water supply in January 2018. The highest level of PFOA detected was 163.9 parts per trillion ("ppt") and the highest level of PFOS detected was 123.6 ppt.

20. In January 2020, Camden removed six wells with significantly elevated levels of PFAS from service. Continued PFAS testing in 2020 revealed additional contamination and two other wells were taken off-line.

21. With these wells off-line, it was necessary to supplement Camden's water supply for the following several years until adequate treatment could be installed to treat the water from the Morris and Delair wellfields that contain PFAS. Camden therefore entered into a 10-year Commodity Demand Water Supply Agreement ("CDWSA") with New Jersey-American Water to meet these needs. Camden purchased 3.0 million gallons per day ("MGD") in 2021 and 2.5 MGD in 2022, 2023, 2024 and 2025, and was paying approximately $300,000 per month for the purchased water.

22. Camden has installed a granulated activated carbon ("GAC") filtration system to remove PFAS at the Parkside Treatment Plant and placed the new Morris Delair PFAS Treatment Facility into service in December 2025, with final completion anticipated in August 2026.

23. **Plaintiff California Water Service Company ("Cal Water")** is a California public utility water corporation incorporated under the laws of the State of California, with its principal place of business in San Jose, California. Cal Water is a Citizen of California.

24. Cal Water owns and operates public drinking water systems that provide potable drinking water to residents and businesses in various locations throughout California, including but not limited to Bakersfield, Bakersfield-North Garden, Marysville, Salinas, Selma, South San Francisco, Stockton, Tulco and Visalia. Each of these systems is subject to the rules and regulations of the California Public Utilities Commission, and with respect to each system, Cal Water has a certificate of convenience and necessity pursuant to which Cal Water has a duty to provide water service.

25. Each of these water systems includes, among other elements, drinking water production wells that draw from groundwater aquifers and associated pumping, storage, treatment and distribution facilities and equipment. Among other things, Cal Water has the right to appropriate and use groundwater for drinking water supplies from such wells.

26. Cal Water's water supply is contaminated with PFAS.

27. **Plaintiff City of Sioux Falls ("Sioux Falls")** is a municipal corporation and public water provider, existing under the laws of the State of South Dakota, with its primary address at 231 N. Dakota Avenue, Sioux Falls, South Dakota, 57104. Sioux Falls is a citizen of South Dakota. Sioux Falls supplies drinking water to customers in Minnehaha and Lincoln Counties and in the City of Sioux Falls. The drinking water is obtained in part from groundwater wells that draw from the Big Sioux Aquifer and the Middle Skunk Creek Aquifer, as well as surface water from the Big Sioux River. Sioux Falls has sustained PFAS contamination in both its groundwater and surface water supplies. Sioux Falls has a property interest in the water it appropriates, treats, stores, and distributes to the public as well as in its wells, piping, distribution system, and water treatment facilities.

28. At least 20 of Sioux Fall's wells are contaminated with PFOS and PFOA, which is believed to have resulted from firefighting training and response activities by Sioux Fall's fire department.

29. **Plaintiff Coraopolis Water & Sewer Authority** ("Coraopolis") is a municipal corporation organized pursuant to laws of the Commonwealth of Pennsylvania. Coraopolis is a citizen of Pennsylvania.

30. Coraopolis operates a Public Water System that draws drinking water from eight groundwater wells located near the Ohio River, and serves 2,616 metered residential, commercial,

industrial and municipal accounts in the Borough of Coraopolis and a small portion of Moon Township in western Pennsylvania.

31. Coraopolis has detected PFAS compounds in sampling from six of its groundwater wells.

32. **Plaintiff Township of Verona ("Verona")** is a citizen of New Jersey, which provides drinking water to a population of approximately 15,000 with approximately 4,179 residential and commercial customer connections.

33. Verona provides drinking water from two wells, both of which had been taken out of service because of PFAS contamination. Prior to the PFAS contamination, Verona supplied most of its water from its own wells and only supplemented its supply with water purchased from the Passaic Valley Water Commission. When the wells were shut down in 2021, 100% of Verona's drinking water had to be purchased from the Passaic Valley Water Commission.

34. PFAS were first detected in Verona's wells in December 2020. The highest level of PFOA detected was 23.3 ppt and the highest level of PFOS detected was 9.11 ppt.

35. In March 2025, Verona's Linn Drive Well was put back into operation following the installation of PFAS treatment. The other well, Fairview Avenue, has yet to come back online.

**<u>Party Defendants</u>**

36. Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217.

37. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied raw telomer iodides used in the manufacturing of fluorochemical products for use in AFFF sold throughout the United States.

38. Upon information and belief, Archroma is a successor to Clariant Corporation.

39. Defendant designed, manufactured, marketed, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS, including but not limited to PFOA, and/or its chemical precursors for use in AFFF.

40. The Proposed Class Representatives, individually and on behalf of similarly situated Public Water Systems, seek damages against Defendant as set forth herein relating to the PFAS contamination or threatened PFAS contamination of their water supplies by Defendant's products.

## GENERAL FACTUAL ALLEGATIONS

### A. PFAS Contamination

41. PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

42. PFOA is one of the two most widely studied types of PFAS substances.

43. PFOA has unique properties that causes it to be: (i) toxic, meaning that it poses serious health risks to humans and animals; (ii) mobile and persistent, meaning that it readily spreads into the environment and does not degrade; and (iii) bioaccumulative and biomagnifying, meaning that it tends to accumulate in organisms, including people, and moves up the food chain.

44. PFOA easily dissolves in water, and therefore is mobile and easily spreads in the environment. PFOA also readily contaminates soils and leaches from the soil into groundwater, where it can travel significant distances.

45. PFOA is characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA is thermally, chemically, and biologically stable and resists degradation from light, water, and biological processes.

46. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

47. PFOA bioaccumulates and biomagnifies in numerous ways. First, it is relatively stable once ingested, so that it bioaccumulates in individual organisms, including people, for significant periods of time. Because of this stability, any newly ingested PFOA will be added to any PFOA already present in the body. In humans, PFOA remains in the body for years.

48. PFOA also biomagnifies up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA.

49. The chemical structure of PFOA makes it resistant to breakdown or environmental degradation. As a result, it is persistent when released into the environment.

50. Exposure to PFAS is toxic and poses serious health risks to humans and animals, including cancer in humans.

51. PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

52. AFFF can be made without the fluorosurfactants that contain PFOA and/or its precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA and/or its precursor chemicals into the environment.

53. Defendant was or should have been aware that the raw telomer iodides it designed, manufactured, marketed, distributed, and/or sold for use in the manufacturing of fluorosurfactants would be used in a manner that would foreseeably contaminate Plaintiffs' water supplies, including through the use of AFFF.

54. Defendant designed, manufactured, marketed, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactants containing PFOA, and/or its chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed of at, near or within the vicinity of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members, and they entered the environment, migrated through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating or threatening to contaminate the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

55. As a direct and proximate result of Defendant's acts and omissions, as alleged in this Class Action Complaint, the respective drinking water supplies of the Proposed Class Representatives and Proposed Class Members have been contaminated and will continue to be contaminated with PFAS, including PFOA, thereby creating an environmental and public health hazard and requiring treatment and remediation.

56. As a direct and proximate result of Defendant's acts and omissions, the Proposed Class Representatives and Proposed Class Members have incurred, and will continue to incur, investigation, treatment, filtration, monitoring, operation and maintenance costs and other damages.

57. Defendant had, and breached, a duty to minimize the environmental harm caused by its raw telomer iodides used in the manufacturing of fluorosurfactant products containing

PFAS. Defendant also had a duty to provide adequate warnings of the risks of its products to all persons whom its product might foreseeably harm.

**<u>The Impact of PFAS on the Drinking Water Supplies of the Proposed Class Representatives and the Proposed Class</u>**

58. The drinking water supplies of the Proposed Class Representatives and the proposed Class have been contaminated with PFAS from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants for use in PFAS-containing products, including AFFF.

59. PFAS from AFFF products have traveled via surface water, stormwater, groundwater, etc., and have contaminated the drinking water supplies of the Proposed Class Representatives and the proposed Class.

60. The detection and/or presence of PFAS in the drinking water supplies of the Proposed Class Representatives and Proposed Class Members has resulted, and will continue to result, in significant injuries and damage to the Proposed Class Representatives and the proposed Class.

61. The invasion of the respective properties of the Proposed Class Representatives and Proposed Class Members with PFAS from AFFF products is recurring—new contamination flows regularly and constantly through the groundwater and into the property each day, resulting in new harm to the property of the Proposed Class Representatives and Proposed Class Members on each occasion.

62. Because of the risks that PFAS pose to human health, on March 14, 2023, the EPA announced its proposed national maximum contaminant level ("MCL") of 4 parts per trillion for each of PFOA and PFOS in drinking water and health-based maximum contaminant level goals ("MCLGs") of zero for each of PFOA and PFOS in drinking water.

63. On April 10, 2024, EPA finalized an MCL of 4 ppt for PFOA and 4 ppt for PFOS in public drinking water supplies.

64. The injuries to the Proposed Class Representatives and Proposed Class Members caused by Defendant's conduct constitute an unreasonable interference with, and damage to, their respective properties for which they are entitled to any and all damages provided by law.

## CLASS ACTION ALLEGATIONS

65. Defendant's unlawful conduct, as set forth herein, caused PFAS resulting from the use of Defendant's raw telomer iodides in the manufacturing of fluorosurfactants products to enter the groundwater and surface water, ultimately resulting in the contamination of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

66. The Proposed Class Representatives and Proposed Class Members have suffered, and will continue to suffer, property damage because of the presence of PFAS as a result of Defendant's raw telomer iodides being used in the manufacturing of fluorosurfactants products in their drinking water supplies.

67. The Proposed Class Representatives bring this class action on behalf of themselves and all other similarly situated Public Water Systems.

68. The Proposed Class Members are defined as:

> Every Active Public Water System in the United States that—(i) has one or more Impacted Water Sources as of July 31, 2026, or (ii) was required to test for certain PFAS under UCMR-5, or otherwise serves more than 3,300 people according to SDWIS.

69. The following are specifically excluded as members of the proposed class:

(a) Any Public Water System that is solely owned by a State government and lacks independent authority to sue and be sued;

(b) Any Public Water System that is solely owned by the federal government and lacks independent authority to sue and be sued;

(c) Any privately owned well that provides water only to its owner's (or its owner's tenant's) individual household and any other system for the provision of water for human consumption that is not a Public Water System.

70. As used herein, "Public Water System" means a system for the provision of water to the public for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves at least twenty-five (25) individuals. As used herein, a "Public Water System" shall include the owner and/or operator of that system and any public entity that is legally responsible for funding (by statute, regulation, other law, or contract), other than a State or the federal government, a Public Water System described in such Paragraph or has authority to bring a claim on behalf of such a Public Water System.

71. As used herein, "Impacted Water Source" means a Water Source that has a Qualifying Test Result showing a Measurable Concentration of PFAS. A "Qualifying Test Result" means any result of a test conducted by or at the direction of a Class Member or of a federal, state, or local regulatory authority, or any test result reported or provided to the Class Member by a certified laboratory or other Person, that used any state or federal agency-approved or validated analytical method to analyze Drinking Water or water that is to be drawn or collected into a Class Member's Public Water System. A "Measurable Concentration" means the lower of a concentration equal to or greater than the limit of detection of the analytical method used (regardless of whether that limit is higher than, lower than, or equal to any limit established for any purpose by federal or state law) or one part per trillion (one nanogram per liter).

72. This action satisfies the ascertainability, numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.

73. Ascertainability. The members of the proposed Class are readily ascertainable without extensive and individualized fact-finding and have been identified as putative Class Members by reference to publicly available information. Each public water provider in the United States is a permitted entity that is regulated by the EPA. The EPA assigns a unique identification number, called a "PWSID," to each public water provider and maintains a centralized database that contains an inventory of all Public Water Systems in America. This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all Public Water Systems as well as administrative contact information. Thus, all Public Water Systems can be readily ascertained based on their registration and respective, system-specific information in the Federal SDWIS database. Class Notice will be delivered to all eligible Public Water Systems via direct and publication notice. Public Water Systems may also identify themselves as Class Members by submitting a Claims Form and providing additional information, including testing data showing PFAS detections.

74. Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. Approximately 15,000 Public Water Systems are estimated to fall within the Class definition. The Class Members are geographically located across the United States, making their joinder even more impracticable.

75. Existence and Predominance of Common Questions of Law and Fact. Common questions of law and fact exist as to all Proposed Class Members that predominate over any questions affecting individual Class Members. All Proposed Class Members have been subject to the same unlawful conduct of the Defendant and have suffered the same resulting injuries—

contamination of their drinking water wells and/or water supplies. Questions of law or fact which are common to the Proposed Class Members, as set forth in this Complaint, predominate over questions affecting individual members because the Proposed Class Members are similarly situated victims of Defendant's common course of unlawful conduct. Defendant's conduct similarly harmed all Proposed Class Members because Defendant designed, manufactured, marketed, distributed, and/or sold the raw telomer iodides used in the manufacturing of fluorosurfactants contained in PFAS-containing AFFF products that infiltrated the Proposed Class Members' drinking water wells and water supplies. In addition, Defendant has no defenses specific to individual Class Members, and its defenses, if any, apply equally to all Proposed Class Members. The common legal and factual questions include, but are not limited to, the following:

a. When the Defendant designed, manufactured, and sold raw telomer iodides used in the manufacturing of fluorosurfactant for use in PFAS-containing products that would end up in the environment, including in the AFFF products;

b. Whether Defendant owed a duty to the Proposed Class Members to refrain from the conduct that led to the contamination of their drinking water wells and water supplies with Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants;

c. Whether there is sufficient evidence that Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants posed/pose a risk of harm to the environment and human health;

d. Whether Defendant knew and/or should have known that its raw telomer iodides used in the manufacturing of fluorosurfactants contained in the AFFF products posed/pose a risk of harm to the environment and human health;

e. The extent to which Defendant became aware that its raw telomer iodides used in the manufacturing of fluorosurfactants posed a risk of harm to the environment and human health;

f. Whether Defendant provided adequate warnings about the potential harms associated with Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants;

g. Whether Defendant provided adequate instructions for the use of its raw telomer iodides used in the manufacturing of fluorosurfactants;

h. Whether Defendant provided adequate instructions for the disposal of waste generated by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants;

i. Whether Defendant made misleading representations or omissions with respect to the environmental and health effects of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants;

j. Whether Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants were defectively and/or negligently designed;

k. Whether Defendant owed the Proposed Class Members duties, including a duty to warn about the propensity of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants to contaminate surface water and groundwater used by Public Water Systems;

l. Whether Defendant failed to warn about the environmental and health risks posed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants;

m. Whether Defendant, through its actions and omissions, breached its duties to the Proposed Class Members;

n. Whether Defendant, through its actions and omissions, directly and proximately caused the Proposed Class Members' injuries and damages;

o. Whether Defendant's conduct supports an award of statutory damages; and

p. Whether the Proposed Class Representatives and Proposed Class Members are entitled to damages.

76. The injuries sustained by the Proposed Class Representatives and Proposed Class Members flow, in each instance, from a common nucleus of operative facts—Defendant's misconduct relating to Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants that now contaminate drinking water supplies across the country.

77. These questions of law and fact that are common to the Proposed Class Representatives and Proposed Class Members predominate over any questions affecting them individually.

78. Typicality. The claims of the Proposed Class Representatives are typical of the claims of the Proposed Class Members in that the Proposed Class Representatives, like the Proposed Class Members, own and/or operate Public Water Systems that are or may become contaminated with PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants contained in the AFFF products or otherwise, and have incurred costs or will incur costs to test for and/or remove PFAS from their respective drinking water wells and water supplies.

79. Adequacy of Representation. The Proposed Class Representatives will fairly and adequately protect the interests of the Proposed Class Members. The Proposed Class Representatives have retained Proposed Class Counsel, all of whom are experienced in highly complex litigation, including litigation involving public entities, widescale environmental damage, class actions and mass torts. Neither the Proposed Class Representatives nor Proposed Class Counsel have any adverse or antagonistic interests to those of the Proposed Class Members, and they will fairly and adequately protect the interests of the Proposed Class Members. Proposed Class Counsel are unaware of any interests adverse or antagonistic to those of the Proposed Class Representatives and the Proposed Class Members.

80. Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy. Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis. Individualized litigation would

create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the judicial system, and the issues raised by this action. The class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

## FIRST CAUSE OF ACTION
## PUBLIC NUISANCE

81. The Proposed Class Representatives reaffirm each and every factual allegation set forth in all preceding paragraphs as if fully restated in this count.

82. Defendant designed, manufactured, marketed, distributed, and/or sold the raw telomer iodides used in the manufacturing of fluorosurfactants contained in AFFF products, thus creating or participating in creating a public nuisance that is harmful to health and obstructs the use of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

83. The presence of PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants products interferes with the use of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

84. The presence of PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants in the drinking water supplies of the Proposed Class Representatives and Proposed Class Members caused and/or continues to cause significant costs, inconvenience and annoyance to the Proposed Class Representatives and the Proposed Class

Members, who are all charged with supplying potable drinking water to residents and businesses in various locations throughout the United States.

85. The presence of PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants in the drinking water supplies of the Proposed Class Representatives and Proposed Class Members affects a substantial number of people nationwide who rely upon the water wells and water supplies of the Proposed Class Representatives and Proposed Class Members for commercial and recreational purposes, and it interferes with the rights of the public at large to clean and safe drinking water resources and environment.

86. An ordinary person would be reasonably annoyed and/or disturbed by the presence of PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants in public drinking water supplies which endangers human health and degrades water quality.

87. The seriousness of the environmental and human health risk of PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants products in the drinking water supplies of the Proposed Class Representatives and Proposed Class Members far outweighs the social utility, if any, of Defendant's conduct in designing, manufacturing, marketing, distributing and selling raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS and concealing the dangers posed to human health and the environment.

88. The Proposed Class Representatives and Proposed Class Members have suffered and will continue to suffer this particularized harm which is different from the type of harm suffered by the general public at large, as the Proposed Class Representatives and Proposed Class

Members have incurred and/or will incur substantial costs to remove PFAS from their water supplies.

89. The Proposed Class Representatives and Proposed Class Members did not consent to the conduct that resulted in the contamination of their respective drinking water supplies.

90. Defendant's conduct was a substantial factor in causing the harm to the Proposed Class Representatives and Proposed Class Members.

91. Defendant knew or, in the exercise of reasonable care, should have known that the manufacture and sale of raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS was causing the type of contamination now found in and around the respective drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

92. At all relevant times, Defendant knew or should have known that its raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendant, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water supplies.

93. As a direct and proximate result of Defendant's creation of a public nuisance, the Proposed Class Representatives and Proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

94. Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, because Defendant designed, manufactured, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS knowing that toxic PFAS would be released and would last for centuries.

**SECOND CAUSE OF ACTION**
**PRIVATE NUISANCE**

95. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

96. The respective drinking water supplies of the Proposed Class Representatives and Proposed Class Members have been contaminated by PFAS as a direct and proximate result of the unreasonable acts and omissions of Defendant as set forth herein.

97. The PFAS contamination caused by Defendant's unreasonable acts and/or omissions has substantially damaged the respective drinking water supplies of the Proposed Class Representatives and Proposed Class Members, and interfered with the ordinary safety, use, benefit, and enjoyment of their respective drinking water supplies.

98. At all relevant times, Defendant knew or should have known that PFAS resulting from its raw telomer iodides used in the manufacturing of fluorosurfactant products would contaminate water supplies and are associated with serious illnesses and cancers in humans. Defendant thus knew, or should have known, that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water supplies.

99. As a direct and proximate result of Defendant's creation of a private nuisance, the Proposed Class Representatives and Proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

100. Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, because Defendant designed, manufactured, marketed, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS knowing that PFAS would be released, could not be contained, and would last for centuries.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY- DESIGN DEFECT
## CONSUMER EXPECTATION TEST

101. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

102. The Proposed Class Representatives and Proposed Class Members were harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactants containing PFAS which were designed, manufactured, marketed, distributed and sold by Defendant, and which were dangerous to an extent beyond that contemplated by the ordinary consumer, defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

103. The design of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS was defective because the products did not perform as safely as an ordinary consumer would have expected them to perform.

104. Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS did not perform as safely as an ordinary consumer would have expected them to perform when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

105. The drinking water supplies of the Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

106. The failure of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS to perform safely was a substantial factor in causing

harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

107. Defendant had actual knowledge that its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were causing the type of harm suffered by the Proposed Class Representatives and Proposed Class Members.

108. Defendant knew or should have known that its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

109. Defendant's conduct lacked care and was a departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant was negligent.

110. Defendant designed, manufactured, marketed, distributed, and sold its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## FOURTH CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT
## RISK-BENEFIT TEST

111. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

112. The Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS which were designed, manufactured, marketed, distributed, and sold by Defendant, and which were defectively designed in that their safety risks outweighed their benefits, if any.

113. The design of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS was a substantial factor in causing harm to the Proposed Class Representatives and Proposed Class Members.

114. The gravity of the huge environmental harm resulting from the use of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS was, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

115. The likelihood of this harm was, is, and will continue to be very high because Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were toxic, cannot be contained, and do not readily degrade in the environment.

116. Defendant knew and/or should have known that its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were toxic, could not be contained, and do not readily degrade in the environment.

117. Defendant's conduct lacked care and was a departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and thus the Defendant was negligent.

118. Defendant designed, manufactured, marketed, distributed, and sold raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, and that these dangers significantly outweighed any benefits of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE - DESIGN DEFECT

119. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

120. The Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS which were designed, manufactured, marketed, distributed, and sold by Defendant, and which were defectively designed in that they were dangerous to an extent beyond that contemplated by the ordinary consumer, and their safety risks outweighed their benefits, if any, and they did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

121. At all relevant times, Defendant had a duty not to place a defective product into the stream of commerce, meaning that Defendant had a duty not to place into the stream of commerce any product that was unreasonably dangerous.

122. Defendant breached that duty by designing, marketing, distributing, and selling its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS which, at all relevant times, were unreasonably dangerous.

123. Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS, that were used in the vicinity of the drinking water supplies of the Proposed Class Representatives and/or Proposed Class Members, were defective in design and unreasonably dangerous because, among other things:

a. Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS caused and/or would continue to cause extensive and persistent contamination of groundwater when used in its foreseeable and intended manner;

b. Contamination with Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS in drinking water poses significant risks to public health and welfare; and

c. Defendant failed to conduct and/or disclose adequate scientific studies to evaluate the impact of PFAS contamination from its raw telomer iodides

used in the manufacturing of fluorosurfactant products on the environment and human health.

124. At all relevant times, Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were dangerous to an extent beyond that contemplated by the ordinary consumer and posed a foreseeable risk of harm that outweighed the cost to Defendant of measures designed to mitigate that risk.

125. Defendant knew or should have known that at the time of manufacture of their raw telomer iodides for use in the manufacturing of fluorosurfactant products that PFAS was not biodegradable and bioaccumulated in fish, wildlife, and humans.

126. As a direct and proximate result of Defendant's negligence, the Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by the contamination of their respective drinking water supplies with PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products.

127. Upon information and belief, Defendant knew and/or should have known that its raw telomer iodides used in the manufacturing of fluorosurfactant products would result in injury to the Proposed Class Representatives and Proposed Class Members.

128. Defendant's conduct lacked care and was a departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant was negligent.

129. Defendant designed, manufactured, marketed, distributed, and/or sold its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that PFAS would be released, could not be contained, and would last for centuries.

## SIXTH CAUSE OF ACTION
## STRICT LIABILITY- FAILURE TO WARN

130. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

131. The Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS which were designed, manufactured, marketed, distributed, and/or sold by Defendant, without adequate warning of toxicity, potential human health risks, and environmental hazards.

132. Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

133. The potential environmental hazard and toxicity risks of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendant's superior knowledge about PFAS at the time of the design, manufacturing, marketing, distribution, and selling of its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

134. The potential environmental hazard and toxicity risks presented a substantial danger when Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

135. Defendant had strict duties not to design, manufacture, market, distribute or sell its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS without adequate warnings of the potential risks associated with their products, which Defendant knew or should have known resulted from the foreseeable use, storage and/or disposal of its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

136. Defendant breached these duties by failing to adequately warn or instruct of the potential risks associated with the application, use and disposal of its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS and the dangers to drinking water supplies that were contaminated with PFAS.

137. The lack of sufficient instructions or warnings was a direct, proximate and/or substantial factor in causing harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

138. Defendant's conduct lacked care and was a departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, the Defendant was negligent.

139. Defendant designed, manufactured, marketed, distributed, and/or sold its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO WARN

140. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

141. The Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS which were designed, manufactured, marketed, distributed, and/or sold by Defendant without adequate warning of toxicity, potential human health risks, and environmental hazards.

142. Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

143. The potential environmental hazard and toxicity risks of Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendant's superior knowledge about their raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation and/or use of their raw telomer iodides.

144. Defendant had a duty to the Proposed Class Representatives and Proposed Class Members to warn about the potential environmental hazard and toxicity risks associated with Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

145. Defendant breached this duty by failing to adequately warn or instruct of the potential risks associated with their raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

146. Defendant had a duty to the Proposed Class Representatives and Proposed Class Members to provide sufficient instructions or warnings relating to Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS so as to avoid contamination of drinking water wells and water supplies throughout the United States.

147. Defendant breached this duty by failing to provide sufficient instructions or warnings relating to its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS so as to avoid contamination of drinking water supplies throughout the United States.

148. Defendant's breaches were a substantial factor in causing harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

149. Defendant knew or reasonably should have known that users would not realize the dangers associated with Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

150. Defendant's conduct lacked care and was a departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendant was negligent.

151. Defendant designed, manufactured, marketed, distributed, and/or sold raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## EIGHTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO RECALL

152. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

153. Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were designed, manufactured, marketed, distributed and sold by Defendant, without adequate warning of toxicity, potential human health risks, and environmental hazards.

154. Defendant had a duty to use reasonable care to warn or instruct about the risks associated with its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

155. Defendant breached the duty to use reasonable care by failing to warn or instruct about the risks associated with its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

156. Defendant had a duty to recall its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS when it knew or should have known about the risks associated with raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

157. Defendant breached the duty to recall by failing to recall its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS when it first learned or should have learned about the risks associated with its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

158. Defendant knew or reasonably should have known that its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS were dangerous or likely to be dangerous when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

159. At all relevant times, Defendant knew or reasonably should have known that users would not realize the danger associated with its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

160. At all relevant times, Defendant knew or reasonably should have known of the human health risks and environmental dangers presented by its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

161. A reasonable developer, manufacturer, formulator, distributor, seller, transporter and/or user of products under the same or similar circumstances would have recalled Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS.

162. The Proposed Class Representatives and Proposed Class Members were harmed by Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS, which have contaminated their drinking water supplies.

163. Defendant's failure to warn and/or recall its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS was a substantial factor in causing the harm suffered by the Proposed Class Representatives and Proposed Class Members.

164. Defendant's conduct lacked care and was an extreme departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendant was negligent.

165. Defendant designed, manufactured, marketed, distributed and sold raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## NINTH CAUSE OF ACTION
## TRESPASS

166. The Proposed Class Representatives reallege and reaffirm all factual allegations set forth in the preceding paragraphs.

167. The Proposed Class Representatives and Proposed Class Members own and/or operate drinking water systems that draw their water from various sources, including groundwater and surface water.

168. The Proposed Class Representatives and Proposed Class Members have significant property interests in the waters they appropriate and use, and they also have significant property interests in the groundwaters that supply their drinking water wells.

169. Defendant intentionally, recklessly, and/or negligently caused PFAS resulting from its raw telomer iodides used in the manufacturing of fluorosurfactant products to enter the groundwaters, aquifers, and drinking water supplies owned and/or operated by the Proposed Class Representatives and Proposed Class Members.

170. The Proposed Class Representatives and Proposed Class Members did not give permission for the entry of PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products onto their respective properties.

171. The Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by PFAS resulting from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products which have contaminated their drinking water supplies.

172. Defendant's unlawful conduct was a substantial factor in causing the harm that the Proposed Class Representatives and Proposed Class Members have suffered and/or continue to suffer.

173. Defendant's conduct relating to its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS lacked any reasonable care and was an extreme departure from what reasonably careful companies would do in the same situation to prevent harm to others and the environment, and, thus, Defendant was grossly negligent.

174. Defendant's conduct in trespassing on the property of the Proposed Class Representatives and Proposed Class Members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, because Defendant designed, manufactured, marketed, distributed and sold its raw telomer iodides used in the manufacturing of fluorosurfactant products containing PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**PRAYER FOR RELIEF**

WHEREFORE, the Proposed Class Representatives, on behalf of themselves and the Proposed Class Members, request that the Court enter an Order or judgment against Defendant, jointly and severally, as follows:

1. Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of the Proposed Class Representatives as Class Representatives and the proposed Counsel as Class Counsel;

2. Compensatory and/or consequential damages according to proof including, but not limited to:

   a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products on and within the drinking water wells and water supplies of the Proposed Class Representatives and the Proposed Class Members,

   b. costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination from Defendant's raw telomer iodides used in the manufacturing of fluorosurfactant products of the drinking water wells and water supplies of the Proposed Class Representatives and the

Proposed Class Members, or, in the alternative, the costs and expenses associated with and related to the removal and disposal of such contamination; and

c. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within the drinking water wells and water supplies of the Proposed Class Representatives and the Proposed Class Members; and

3. Statutory damages;

4. Costs, disbursements and attorneys' fees of this lawsuit;

5. Pre-judgment and post-judgment interest on the monetary relief; and

6. Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

The Proposed Class Representatives demand a trial by jury.

Dated: July 13, 2026

Respectfully Submitted,

/s/ Michael A. London
Michael A. London
Douglas and London PC
One State Street, 35th Floor
New York, NY 10004
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

/s/ Scott Summy
Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com

/s/ Joseph Rice
Joseph Rice
Motley Rice LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
P: (843) 216-9000
jrice@motleyrice.com

*Proposed Class Counsel*